David DALIBERTI, et al., Plaintiffs,

v.

REPUBLIC OF IRAQ, Defendant.

Civil Action No. 96–1118 (PLF).

United States District Court,
District of Columbia.

May 23, 2000.

Andrew C. Hall, Miami, FL, Nelson M. Jones, III, Nicholas & Jones, Houston, TX, James Cooper–Hill, Rockport, TX, for Plaintiffs.

Samuel Finley McNeil, III, McLean, VA, for Defendant.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

Plaintiffs have brought suit seeking damages for claims arising out of various instances of alleged torture suffered at the hands of the defendant, the Republic of Iraq, a sovereign nation. Defendant has moved to dismiss for lack of personal and subject matter jurisdiction and for failure to state a claim under Rule 12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure. Iraq asserts that the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, gives it immunity from suit in the courts of this country and that none of the exceptions to the FSIA applies in this instance. It also argues that because Iraq has insufficient contacts with the United States, no U.S. court has personal jurisdiction over Iraq. Finally, defendant asserts that the case should be dismissed under the act of state doctrine.

The Court concludes that defendant's alleged actions fall within a category of conduct that Congress specifically intended to exempt from FSIA protection when it amended the FSIA to include an exception for state sponsored acts of terrorism. The Court also concludes that defendant's alleged conduct does not fall under any of the other exceptions to the FSIA, and that claims brought exclusively under those exceptions, including claims brought by the spouses of those asserting they were victims of terrorism, must be dismissed for lack of subject matter jurisdiction and for failure to state a claim. With regard to the surviving claims, the Court concludes both that it has personal jurisdiction and that plaintiffs have adequately stated claims upon which relief can be granted.

The act of state doctrine does not bar this suit.

## I. BACKGROUND

Plaintiffs' claims arise out of three separate but similar incidents in which the defendant arrested and detained the male plaintiffs, all of whom are United States citizens who were doing business in Kuwait. The four male plaintiffs seek damages for acts of kidnapping, false imprisonment and torture; the spouses of the four men seek damages for pain and suffering and loss of consortium.

Plaintiff Chad Hall was removing land mines within the borders of Kuwait in October 1992 when he allegedly was kidnapped at gunpoint and removed from Kuwait to Baghdad, Iraq. Compl. ¶ 15. Hall was held as a prisoner by the government of Iraq, although it is not clear from the pleadings for how long, and he claims that Iraq tortured him while he was a prisoner. See id. Hall's claims arise out of acts both within defendant's territorial jurisdiction (the imprisonment and torture), and outside its territorial jurisdiction (the kidnapping in Kuwait). Hall brought suit on these same claims prior to enactment of the state sponsored terrorism exception to the FSIA, and his claims initially were dismissed for lack of subject matter jurisdiction. See Hall v. Socialist People's Republic of Iraq, Civil Action No. 92–2842, Memorandum and Order (D.D.C. Dec. 9, 1994), aff'd without opinion, 80 F.3d 558 (D.C.Cir.1996).

Plaintiff Kenneth Beaty was traveling within the borders of Kuwait in April 1993 when he approached a border checkpoint between Kuwait and Iraq. Compl. ¶ 10. Beaty asked an Iraqi border guard for directions to an oil well on the Kuwaiti side of the border without entering Iraq. Id. Beaty was arrested by agents of Iraq and taken to Baghdad where he was allegedly held under inhumane circumstances and subjected to torture. Id. Beaty was tried in an Iraqi court on charges of "illegal entry" and espionage and found not guilty.

Compl. ¶ 11. Beaty was told that he was free to leave the Republic of Iraq, but before he could actually leave he was informed that "notwithstanding the [acquittal], [ ] he was sentenced to eight years ... in prison." Compl. ¶¶ 11, 12. Beaty was held for a period of 205 days, at which point his release was secured with the assistance of former Senator David Boren who traveled to Iraq at the behest of the President of the United States for the express purpose of negotiating Beaty's release. Compl. ¶¶ 12, 14. In addition to the efforts of Senator Boren, Beaty's wife, Robin Beaty (also a plaintiff in this action), arranged for the delivery of "several million dollars" in humanitarian aid to Iraq. Compl. ¶ 14. Beaty's claims, like Hall's, arise out of acts committed both within Iraq (the imprisonment and torture) and in Kuwait or international "no-man's-land" (the "arrest" at the border checkpoint).

Plaintiffs David Daliberti and William Barloon were traveling within the borders of Kuwait in March 1995 when they approached a border checkpoint between that nation and Iraq. Compl. ¶ 4. An agent of the defendant examined the identification papers of the two plaintiffs which identified them as American citizens. Id. The agent then "raised the barricade blocking the path ... and gave permission to Plaintiffs ... to enter the territory of Defendant." Id. After entering defendant's territory, Daliberti and Barloon determined that they "had not arrived at their intended lawful destination." Compl. ¶ 5. They then returned to the border checkpoint and requested passage back into Kuwait. Id. They were arrested by the defendant's agents, threatened at gunpoint, and taken to prison, where they allegedly were tortured and held under inhumane conditions. Compl. ¶¶ 5, 6. Daliberti and Barloon were tried in an Iraqi court and found guilty of "illegal entry," without being afforded an opportunity to defend themselves. Compl. ¶ 7. They were held for 126 days before their release was secured by negotiations be-

tween the government of Iraq and Congressman Bill Richardson who had been dispatched by President Clinton to secure their release. Compl. ¶ 9. Daliberti and Barloon's complaints arise out of acts that occurred entirely within the borders of Iraq.

Plaintiffs Kathy Daliberti, Robin Beaty, Elizabeth Hall and Linda Barloon (the "spouse plaintiffs") seek recovery for claims of intentional infliction of emotional distress and loss of consortium as a result of the acts committed against their husbands. Compl. ¶¶ 17, 20, 21, 25. None of the spouse plaintiffs was in the territory of Iraq at any time relevant to these proceedings. The spouse plaintiffs therefore allege harm based on conduct committed only in Kuwait and Iraq, but affecting them in the United States.

Each of the male plaintiffs is seeking compensatory damages of $20 million, and each of the spouse plaintiffs is seeking compensatory damages of $5 million. Compl. at 13–14. Plaintiffs ask that any judgment in their favor be enforced through the seizure of Iraqi assets in this country. Compl. ¶ 32.

Plaintiffs filed their complaint in May 1996. As part of the process to secure jurisdiction under the FSIA, they afforded the defendant an opportunity to arbitrate these claims pursuant to international rules of arbitration. Compl. ¶ 1; *see also* 28 U.S.C. § 1605(a)(7)(B)(i) (claim will be dismissed unless there is an offer to arbitrate). Summonses were served on the defendant via the United States Interests Section of the Polish Embassy in Baghdad. *See* Notice of Service of Summons & Complaint, Sept. 12, 1996. On October 25, 1996, plaintiffs moved for, and subsequently were granted, an entry of default against the defendant for its failure to file a response. *See* Default, Nov. 27, 1996. Plaintiffs were directed by the Court to file a motion for default judgment accompanied by factual evidence of their claims, *see* 28 U.S.C. § 1608(e); Order of Jan. 13, 1997, which plaintiffs did on January 29,

1997. On February 23, 1998, the parties jointly filed a stipulation asking that the default entered by the Clerk be vacated. The Court approved the stipulation, set aside the entry of default and denied plaintiffs' motion for default judgment as moot. *See* Order of Mar. 6, 1998; Order of Mar. 9, 1998.

## II. THE FOREIGN SOVEREIGN IMMUNITIES ACT

 The Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Federal district courts have exclusive jurisdiction over civil actions against a foreign state, regardless of the amount in controversy, provided that the foreign state is not entitled to immunity under the FSIA. *See* 28 U.S.C. §§ 1330, 1604; *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. at 434–35, 109 S.Ct. 683. Under the FSIA, a foreign state is presumed to be immune from suit, 28 U.S.C. § 1604, and is in fact immune unless one or more of the exceptions to immunity enumerated in the FSIA apply. *See* 28 U.S.C. §§ 1605–1607; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). Once a defendant presents a prima facie case that it is a foreign sovereign, plaintiffs bear the burden of producing evidence to show that there is no immunity and that the court therefore has jurisdiction over the claims. *See Drexel Burnham Lambert Group Inc. v. Committee of Receivers for Galadari*, 12 F.3d 317, 325 (2d Cir.1993), *cert. denied*, 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2nd Cir. 1993).

 A court may dismiss a complaint brought under the FSIA only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims that

would entitle them to relief. *See Neitzke v. Williams*, 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *cf. Saudi Arabia v. Nelson*, 507 U.S. at 351, 113 S.Ct. 1471 (in reviewing dismissal under FSIA, court accepts all factual allegations as true). Once plaintiff has produced evidence that an exception applies, defendant must produce evidence of its entitlement to immunity; "[i]f any of the exceptions appears in the pleadings or is not refuted by the foreign state asserting the defense, the motion to dismiss the complaint must be denied." *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F.Supp. 289, 294 (S.D.N.Y.1987). Since at this stage the Court must accept as true all facts alleged by the plaintiffs, the question is whether the facts alleged are sufficient to establish the jurisdiction of this Court under an exception to immunity under the FSIA and sufficient to state a claim upon which relief may be granted.

### A. State Sponsored Terrorism Exception

The state sponsored terrorism exception was enacted by Congress as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), for the purpose of holding rogue states accountable for acts of terrorism perpetrated on United States citizens. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 221(a), 110 Stat. 1214 (codified at 28 U.S.C. § 1605(a)(7)). It provides a cause of action against a foreign state for anyone who alleges that he or she has suffered injury "caused by an act of tor-

ture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources … for such an act." 28 U.S.C. § 1605(a)(7).[1] The legislation was motivated, at least in part, by the ordeal that plaintiff Chad Hall alleges in this suit. *See Foreign Terrorism and U.S. Courts: Hearings Before the Subcomm. on Courts and Admin. Practice of the Senate Comm. on the Judiciary, Regarding S.825, the Foreign Sovereign Immunities Act*, 103d Cong. (June 21, 1994), *available in* 1994 WL 274204 (F.D.C.H.) (statement of Chad Hall). While the AEDPA was enacted well after the events alleged by Hall and all of the other claimants in this case occurred, Congress clearly intended the Act to apply to "any cause of action arising before, on, or after the date of enactment." Pub.L. No. 104–132, § 221(c), 110 Stat. 1214 (codified at 28 U.S.C. § 1605 note). Retroactivity principles therefore are no bar to the application of the state sponsored terrorism exception to this action. *See Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 68–69 (D.D.C.1998); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 13–14 (D.D.C.1998); *Alejandre v. Republic of Cuba*, 996 F.Supp. 1239, 1247 n. 4 (S.D.Fla.1997).

Several suits have been brought under the state sponsored terrorism exception to the FSIA since it has been enacted and codified at 28 U.S.C. § 1605(a)(7). *See Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107 (D.D.C.2000) (suit arising out of hostage taking in Lebanon); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62 (D.D.C.1998) (suit arising out of hostage taking in Lebanon); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C.1998) (suit arising out of bombing

---

1. Because the AEDPA did not provide a specific cause of action for victims of state sponsored terrorism, a separate piece of legislation was enacted to fill the void. Civil Liability for Acts of State Sponsored Terrorism, Pub.L. No. 104–208, § 589, 110 Stat. 3009 (1996) (codified at 28 U.S.C. § 1605 note). Also known as the "Flatow Amendment," the legislation provides a cause of action against a foreign state and its agents for any act which would give a court jurisdiction under 28 U.S.C. § 1605(a)(7). *See* 28 U.S.C. § 1605 note; *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 12–13 (D.D.C.1998). Plaintiffs may seek recovery under this enactment for pain and suffering, economic damages, solatium and punitive damages. 28 U.S.C. § 1605 note.

in Israel which killed American student); *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239 (S.D.Fla.1997) (suit arising out of downing of civilian planes by Cuban Air Force); *Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. 325 (E.D.N.Y.), *aff'd in relevant part,* 162 F.3d 748 (2d Cir.1998), *cert. denied,* 525 U.S. 1003, 119 S.Ct. 2337, 144 L.Ed.2d 235 (1999) (suit by survivors of victims of bombing of Pan Am flight 103 over Lockerbie, Scotland).[2]

■ Section 1605(a)(7) provides an exception to a foreign sovereign's immunity from suit for actions where money damages are sought against a foreign sovereign for:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such an act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7). Three conditions must be met in order to bring suit under this section: (1) the foreign state must have been designated as a state sponsor of terrorism pursuant to either Section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. § 2405(j)) or Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371); (2) if the actionable conduct of the foreign state occurred within that state's territory, then the state must be offered an opportunity to arbitrate the claims; and (3) the plaintiff or the victim must be a United States national. 28 U.S.C. § 1605(a)(7)(A), (B).

The Export Administration Act calls upon the Secretary of State to make a determination that a foreign state has "repeatedly provided support for acts of international terrorism," to notify the relevant committees of both houses of Congress, and to publish the determination in the Federal Register. *See* 50 U.S.C.App. § 2405(j). Once the Secretary's determination has been promulgated, the foreign state must be considered a state sponsor of terrorism until the country in question has provided assurances that it will no longer support acts of international terrorism. *Id.*

■ On September 12, 1990, Acting Secretary of State Lawrence Eagleburger caused to be published in the Federal Register his determination that Iraq was a state sponsor of terrorism. Determination Iraq, 55 Fed.Reg. 37,793 (1990) (codified at 31 C.F.R. § 596.201). No rescission of this designation has been published pursuant to statute, and Iraq remains so designated. *See* 31 C.F.R. § 596.201.[3] The plaintiffs, being United States nationals, and having offered to arbitrate, therefore need only show that Iraq committed one of the predicate acts under 28 U.S.C. § 1605(a)(7) in order for the state sponsored terrorism exception to the FSIA to apply.[4] Defendant argues that the actions complained of did not constitute "torture"

---

**2.** In only one of these cases other than this one, *Rein v. Socialist People's Libyan Arab Jamahiriya,* did the defendant respond to the complaint. The decisions in *Anderson, Cicippio, Flatow* and *Alejandre* all resulted in default judgments. As in suits against the United States, however, the FSIA requires that the court make findings of fact sufficient to support the entry of a default judgment. *See* 28 U.S.C. § 1608(e); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 6. In *Anderson, Cicippio, Flatow,* and *Alejandre,* therefore, the courts heard evidence—albeit only from the plaintiffs—and entered findings of fact.

**3.** The other states so designated are Cuba, Iran, Libya, North Korea, Sudan and Syria. 31 C.F.R. § 596.201.

**4.** Plaintiffs filed their Offer to Arbitrate the same day that they filed the complaint initiating this action. *See* Offer to Arbitrate, May 17, 1996; Compl. ¶ 1. Defendant has not claimed that there was an inadequate opportunity to arbitrate these claims.

or "hostage taking" under the FSIA and therefore do not provide subject matter jurisdiction and do not give rise to a claim upon which relief may be granted. *See* Def. Motion at 27–28.

The FSIA adopts the following definition of "torture" from the Torture Victim Protection Act of 1991 ("TVPA"):

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub.L. No. 102–256, 106 Stat. 73, § 3(b)(1) (1992) (codified at 28 U.S.C. § 1350 note § 3(b)); *see* 28 U.S.C. § 1605(e)(1) ("[T]he terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991."). Similarly, the FSIA adopts by reference the following definition for "hostage taking" from the International Convention Against the Taking of Hostages:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages ("hostage-taking") within the meaning of this Convention.

International Convention Against the Taking of Hostages, Dec. 17, 1979, art. 1, T.I.A.S. No. 11,081; *see* 28 U.S.C. § 1605(e)(2) ("[T]he term 'hostage taking' has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages.").

The complaint alleges that Iraq tortured each of the four male plaintiffs and held plaintiffs David Daliberti, William Barloon and Kenneth Beaty as hostages. Compl. ¶¶ 6–16. David Daliberti and William Barloon allege that they were "blindfolded, interrogated and subjected to physical, mental and verbal abuse" while in captivity. Compl. ¶ 6. They allege that during their arrests one of the agents of the defendant threatened them with a gun, allegedly causing David Daliberti "serious mental anguish, pain and suffering." Compl. ¶ 5. During their imprisonment in Abu Ghraib prison, Daliberti and Barloon were "not provided adequate or proper medical treatment for serious medical conditions which became life threatening." Compl. ¶ 8. The alleged torture of Kenneth Beaty involved holding him in confinement for eleven days "with no water, no toilet and no bed." Compl. ¶ 10. Similarly, Chad Hall allegedly was held for a period of at least four days "with no lights, no window, no water, no toilet and no proper bed." Compl. ¶ 15. Plaintiffs further proffer that Hall was "stripped naked, blindfolded and threatened with electrocution by placing wires on his testicles ... in an effort to coerce a confession from him." Brief in Opp. at 2.

Such direct attacks on a person and the described deprivation of basic human necessities are more than enough to meet the definition of "torture" in the Torture Victim Protection Act and thus to give rise to a claim under the state sponsored terrorism exception to foreign sovereign immunity. *See* 28 U.S.C. § 1605(e)(1). Plaintiffs have alleged sufficient facts to allow a factfinder to conclude that the pain they suffered did not arise from and was not incident to or inherent in lawful sanctions, but was in fact "torture" under the FSIA. Should this case reach trial, the question of

whether plaintiff can prove by a preponderance of the evidence that the defendant committed acts of torture as defined by the statute will be one for the finder of fact. *Cf. Hilao v. Estate of Marcos,* 103 F.3d 789, 792–93 (9th Cir.1996) (jury instructed with TVPA definition of torture in liability phase of trial against former dictator).

▮ The Court also finds that plaintiffs have alleged sufficient facts to allow a reasonable inference that Daliberti, Barloon and Beaty were subjected to "hostage taking" as defined by the International Convention Against the Taking of Hostages. *See* 28 U.S.C. § 1605(e)(2). Plaintiffs allege that David Daliberti and William Barloon were held in prison in an effort to coerce the United States and the United Nations to lift the economic sanctions imposed on Iraq at the end of the Gulf War. Compl. ¶ 9. This purpose was communicated personally by Saddam Hussein to Congressman Bill Richardson, who had traveled to Iraq seeking the release of Daliberti and Barloon. *Id.* Kenneth Beaty was held until the delivery of several million dollars worth of humanitarian aid was arranged by Robin Beaty. Compl. ¶ 14. This aid has been described as "ransom." *Id.*

In sum, the male plaintiffs have met their burden of showing that the actions they complain of fall under the state sponsored terrorism exception to foreign sovereign immunity in 28 U.S.C. § 1605(a)(7). This Court therefore has jurisdiction over the subject matter of this suit. In addition, it is apparent that the male plaintiffs have adequately stated claims under this statute. Accepting the factual allegations in the complaint as true, as it must on a motion to dismiss, the Court therefore must deny defendant's motion to dismiss for want of subject matter jurisdiction and for failure to state a claim under Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.

Arguably, the claims of the spouse plaintiffs could also have been brought under the state sponsored terrorism exception to the FSIA. *See* 28 U.S.C. §§ 1605(a)(7), 1605 note; *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 12–13. Since the spouse plaintiffs bring their claims under the commercial activity exception to the FSIA rather than under the state sponsored terrorism exception, however, the Court will consider only whether it has jurisdiction and whether the spouse plaintiffs have stated claims under the exception they have pleaded in the complaint. It would be inappropriate for this Court, *sua sponte,* to consider the claims of the spouse plaintiffs under exceptions not pleaded. *Compare Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d at 113 (spouse permitted to proceed under state sponsored terrorism exception); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d at 68 n. 7 (same).

### B. Commercial Activity Exception

Plaintiffs also assert jurisdiction under the commercial activity exception to the FSIA for the wrongs allegedly committed against Chad Hall and as a basis for the claims of the spouse plaintiffs. Compl. ¶¶ 15, 17, 18. The commercial activity exception, 28 U.S.C. § 1605(a)(2), provides that a foreign state is not immune from suit where the claim is based on (1) a commercial activity carried on by the foreign state in the United States, (2) an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Quite clearly, plaintiffs rely only on the third category of commercial activity exception. The term "commercial activity" is defined under the Act as a "regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular

transaction or act, rather than by reference to its purpose." *Id.*

■ In examining this statutory language, the Supreme Court has concluded that "the issue is whether the particular actions that the foreign state performs ... are the type of actions by which a private party engages in trade and traffic or commerce" *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation omitted) (finding commercial activity exception to immunity applied where Argentina had sold bonds in the United States and then unilaterally extended time of repayment). "[A] state engages in commercial activity ... where it exercises only those powers that can also be exercised by private citizens, rather than those powers peculiar to sovereigns." *Saudi Arabia v. Nelson,* 507 U.S. at 349–50, 113 S.Ct. 1471 (holding commercial activity exception did not apply where Saudi Arabia arrested and imprisoned U.S. citizen hired in the United States to work in Saudi Arabia).

The Supreme Court's decision in *Nelson* is controlling here. In *Nelson,* the plaintiff was a United States national hired to work in a hospital in Saudi Arabia. After he became a whistleblower as to certain practices of the hospital, he was arrested and imprisoned by the Saudi government. The Supreme Court concluded that only a government has the power to arrest and imprison someone in its territory, even if the arrest was unjustified or motivated by an aspect of a commercial relationship. The arrest and imprisonment therefore could not be considered "commercial" in nature. *Saudi Arabia v. Nelson,* 507 U.S. at 362–63, 113 S.Ct. 1471. In this case, the actions complained of arise out of the arrest and imprisonment of the plaintiff Hall (and the other male plaintiffs). Under the reasoning of the Supreme Court in *Nelson,* Iraq cannot be sued under the commercial activity exception, regardless of Iraq's motivation or justification, because Iraq was exercising its sovereign powers and not the kind of powers exercised by private citizens.

■ With respect to the spouses of the victims of torture, plaintiffs argue (1) that, through its "torture of plaintiff Hall and the holding as hostages of plaintiffs Beaty, Daliberti and Barloon, [Iraq] caused a direct effect in the United States on [the spouse plaintiffs]," Compl. ¶ 17; and (2) that Iraq, through its agents, "promoted, financed, directed, controlled, supported, supplied and developed terrorism in order to further its activities pursuant to 28 U.S.C. § 1605(a)(2)." Compl. ¶ 18. Neither of these allegations is sufficient to provide jurisdiction or to state a claim under the commercial activity exception.

While plaintiffs identify acts outside the United States—torture and hostage-taking and the promotion, support and development of terrorism—and allege that at least some of these activities had a "direct effect" on the spouse plaintiffs who were in the United States, plaintiffs do not identify any "commercial activity" of the defendant besides the funding of terrorism. With respect to that activity, they fail sufficiently to allege that any of the noncommercial acts that had a direct effect on the spouses in the United States were taken "in connection with a commercial activity," an essential predicate for application of the commercial activity exception. While Iraq might have engaged in arguably commercial activity by funding terrorism outside its borders, the acts complained of inside its borders that arguably had a direct effect on the spouses in the United States had no connection with a commercial activity. *See Saudi Arabia v. Nelson,* 507 U.S. at 356–58, 113 S.Ct. 1471 (in order for claim to lie under commercial activity exception the commercial activity itself must give rise to the cause of action). Because the torture and hostage-taking at issue were not done in connection with a commercial activity, there is no jurisdiction under the commercial activity exception. The claims of the spouse plaintiffs and the claim of Chad Hall based on the commer-

cial activity exception therefore must be dismissed for lack of subject matter jurisdiction and for failure to state a claim.[5]

### III. CONSTITUTIONAL CHALLENGES TO THE FSIA

Iraq argues that even if the state sponsored terrorism exception might otherwise apply to the facts of this case, it cannot destroy Iraq's immunity from suit because the exception is unconstitutional. *See* Def. Motion at 5. There are three bases for this contention: (1) that the requirement that a state be designated by the Secretary of State as a state sponsor of terrorism as a precondition for the filing of a lawsuit constitutes an impermissible legislative delegation of power to the Executive Branch to determine the courts' jurisdiction; (2) that the statutory exception to foreign sovereign immunity set out in 28 U.S.C. § 1605(a)(7) violates Iraq's due process right to equal protection by discriminating against those sovereigns designated as state sponsors of terrorism; and (3) that the FSIA as a whole, or at least the state sponsored terrorism exception, violates due process by abrogating the minimum contacts requirement that is always necessary for the exercise of personal jurisdiction. *See* Def. Motion at 5–13.

Preliminarily, the Court notes that there is a serious question whether Iraq has standing to assert these constitutional challenges. "[T]he issue of whether a foreign state is a 'person' for the purposes of Constitutional Due Process analysis has rarely, if ever, been squarely presented for consideration," *Flatow v. Islamic Republic of Iran*, 999 F.Supp. at 19 (citing *Republic of Argentina v. Weltover*, 504 U.S. at 619–20, 112 S.Ct. 2160). When the issue has arisen, courts have applied different reasoning in different contexts. The most direct statement on the issue is found in *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), in which South Carolina complained that several aspects of the Voting Rights Act violated its due process rights by impermissibly delegating power, limiting judicial access and acting as a bill of attainder. The Supreme Court quickly disposed of these claims:

> [T]hese contentions may be dismissed at the outset. The word "person" in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court. Likewise, courts have consistently regarded the Bill of Attainder Clause of Article I and the principle of the separation of powers only as protections for individual persons and private groups, those who are peculiarly vulnerable to non-judicial determinations of guilt.

*B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486–87, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), the courts are "virtually unanimous" in construing the implied waiver provision very narrowly. *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118, 122 (D.C.Cir.1999); *see Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir.1991); *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C.Cir.1990); *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1022 (9th Cir.1987); *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 377 (7th Cir.1985). Because plaintiffs have failed to allege even a single fact that would support a finding of waiver, the Court concludes that the defendant has not, either explicitly or implicitly, waived its immunity from suit in this matter.

---

**5.** Plaintiffs also allege, without explanation, that the Court has jurisdiction over Iraq pursuant to 28 U.S.C. § 1605(a)(1) (the so-called "waiver" exception). Compl. ¶ 15. This exception provides that a foreign state shall not be immune from suit where it has waived its immunity "either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Because there is no explicit waiver here, the question is whether Iraq has implicitly waived its sovereign immunity in this case. "[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1174 (D.C.Cir. 1994); *cert. denied*, 513 U.S. 1121, 115 S.Ct. 923, 130 L.Ed.2d 803 (1995). In keeping with the restrictive theory of foreign sovereign immunity embodied in the FSIA, *see Verlinden*

*State of South Carolina v. Katzenbach,* 383 U.S. at 323–24, 86 S.Ct. 803 (citations omitted).

It would seem that a foreign sovereign should enjoy no greater due process rights than the sovereign States of the Union. As Judge Richey noted: "If the States of the Union have no due process rights, then a 'foreign mission' *qua* 'foreign mission' surely can have none." *Palestine Information Office v. Shultz,* 674 F.Supp. 910, 919 (D.D.C.1987). And Judge Lamberth concluded in *Flatow* that "[g]iven the parallels in the procedural deference granted to both the United States and foreign states ... foreign states should hold comparable status to States of the Union and the federal government for the purposes of Constitutional Due Process analysis." *Flatow v. Islamic Republic,* 999 F.Supp. at 21.

This reasoning has not held, however, in situations where personal jurisdiction under the FSIA has been the subject of challenge. In *Weltover,* the Supreme Court decided simply to "assum[e], without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," and thus for the required minimum contacts analysis necessary to determine personal jurisdiction. *Republic of Argentina v. Weltover, Inc.,* 504 U.S. at 619–20, 112 S.Ct. 2160 (finding minimum contacts existed where "direct effects" prong of commercial activity exception was met). *See Creighton Ltd. v. Government of State of Qatar,* 181 F.3d at 124–25 (recognizing dispute in dicta, but not deciding whether foreign state is "person" for purpose of due process analysis), *El–Hadad v. Embassy of the United Arab Emirates,* 69 F.Supp.2d 69, 77 n. 7 (D.D.C.1999) ("because the D.C. Circuit has not yet resolved whether the due process clause applies to foreign states, the Court considers the [foreign state] a 'person' and conducts the constitutional due process analysis" in commercial activity exception case). Judge Lamberth noted in *Flatow:*

Most courts have simply assumed that foreign states were entitled to Constitutional Due Process protections, just as courts have assumed that foreign corporations are entitled to Constitutional Due Process protections, at least with respect to the assertion of personal jurisdiction. Once these trends were initiated, on the basis of an assumption, courts have been reluctant to reexamine this issue .... The merger of subject matter and personal jurisdictional inquiries under the FSIA has contributed to the confusion in the jurisprudence of personal jurisdiction over foreign states. The majority of cases brought under the FSIA involve commercial activity, which requires an evaluation of the activity's effects in the United States. "Direct effects" language closely resembles that of Constitutional Due Process "minimum contacts." Tandem consideration of these overlapping yet fundamentally discrete analyses as a matter of practice in several Circuits has exacerbated the situation.

*Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 19–20. Indulging the same assumptions as have other courts that a foreign sovereign may enjoy at least certain constitutional protections, the Court will address Iraq's constitutional challenges on their merits.

### A. Separation of Powers

■ Iraq argues that the state sponsored terrorism exception, by requiring a finding by the Secretary of State, impermissibly delegates to an Executive Branch official the power that properly resides in Congress to set the limits of the jurisdiction of the federal courts. *See* Def. Motion at 6–7. This is not so. Prior to the enactment of the FSIA, the State Department always played a substantial and appropriate role in effecting when a foreign sovereign state would enjoy immunity in the courts of the United States. *See National City Bank of New York v. Republic of China,* 348 U.S. 356, 360–61, 75 S.Ct. 423, 99 L.Ed. 389 (1955) ("As the responsible

agency for the conduct of foreign affairs, the State Department is the normal means of suggesting to the courts that a sovereign be granted immunity from a particular suit. Its failure or refusal to suggest such immunity has been accorded significant weight by this Court.") (citations omitted). In enacting the FSIA, Congress codified the standards for the recognition of foreign sovereign immunity, as well as the exceptions to such immunity. *See Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. at 496–97, 103 S.Ct. 1962. With the state sponsored terrorism exception, Congress continued this process by providing that terrorist states are subject to suit in the federal courts. Congress simply chose to define the members of the class of "terrorist states" by reference to a separate determination made by the Secretary of State, an Executive Branch official uniquely situated to make such judgments.

The delegation by Congress of this decision to the Secretary of State does not violate separation of powers. Indeed, the Supreme Court has long recognized the "value of congressional delegation," and has upheld its constitutionality. *See Milk Industry Foundation v. Glickman*, 949 F.Supp. 882, 890 (D.D.C.1996). The principle that Congress may delegate to the Executive Branch the duty to find facts upon which certain enactments are made conditional is firmly established:

> The Constitution ... does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct .... These essentials are preserved

when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework ... [T]he doctrine of separation of powers [does not] deny to Congress power to direct that an administrative officer properly designated for that purpose have ample latitude within which he is to ascertain the conditions which Congress has made prerequisite to the operation of its legislative command.

*Yakus v. United States*, 321 U.S. 414, 424–25, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The Supreme Court has upheld such delegations of power in scores of cases, *see Milk Industry Foundation v. Glickman*, 949 F.Supp. at 889–90, and in fact has declared such delegations of power unconstitutional only twice in its history, "both in the same year and both involving delegations under the same statute, the National Industrial Recovery Act." *Id.* at 889 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)); *see also Clinton v. City of New York*, 524 U.S. 417, 485–86, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Breyer, J., dissenting).

By enacting the state sponsored terrorism exception to the FSIA, Congress has manifested its intent that United States victims of terrorist states be given a United States judicial forum in which to seek redress. *See Flatow v. Islamic Republic of Iran*, 999 F.Supp. at 12–13, 15.[6] It has

---

6. The inclusion of plaintiff Chad Hall's testimony in the legislative history of the Act leads

the Court to the further conclusion that Congress in fact intended that *this very suit* pro-

separately directed the Executive branch to determine which foreign nations are "terrorist states" for the purpose of controlling the export of certain goods, a determination to be made in accordance with standards established by Congress in the Export Administration Act. *See* 50 U.S.C.App. § 2405(j). The FSIA simply references the factual question of whether that designation has been made. The decision of Congress to vest jurisdiction in the federal courts over the class of sovereigns identified as terrorist states and to delegate to the Secretary of State the decision, based on the facts then at her disposal, to determine which sovereign states fall within the class, fully conforms to the requirements of the Constitution. *See Milk Industry Foundation v. Glickman,* 949 F.Supp. at 891 ("[b]y conditioning [its legislative actions] on the making of [an Executive] finding, Congress did not run afoul of the nondelegation doctrine"); *cf. Weidner v. International Telecommunications Satellite Organization,* 392 A.2d 508 (D.C.App.1978) (where International Organizations Immunities Act gave immunity to organizations designated by executive order, such designation was within Presidential authority).

The Second Circuit considered this very issue in *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d at 762–64, and concluded that there was no violation of separation of powers. It relied for its conclusion on a century-old Supreme Court case and on one of its own recent precedents. In *Jones v. United States,* 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890), jurisdiction over the defendant in a murder trial turned on whether the scene of the crime, the Caribbean island of Navassa, was United States Territory. The Supreme Court agreed with the government that the island was U.S. Territory on the basis of a factual determination delegated to and made by the Secretary

of State under the Guano Islands Act of 1856 that the island "appertained to the United States." In *Matimak Trading Co. v. Khalily,* 118 F.3d 76 (2d Cir.1997), jurisdiction turned on whether Hong Kong was a "foreign state" under the alienage statute, 28 U.S.C. § 1332(a). The Second Circuit acknowledged that recognition of foreign states was a prerogative of the Executive Branch, and noted that the court's alienage jurisdiction over a party depended on whether the party's place of citizenship had been recognized by the Executive as a foreign state. The court found that the district court lacked jurisdiction because Hong Kong had not been recognized as a foreign state by the Executive. *Matimak Trading Co. v. Khalily,* 118 F.3d at 79–84. On the basis of these precedents, the court in *Rein* found no violation of separation of powers in Congress delegating to the Secretary of State the decision whether a particular sovereign nation is a terrorist state. *See Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d at 764.

Furthermore, like the situation presented to the court in *Rein,* Iraq was already on the list of states designated as state sponsors of terrorism at the time the AEDPA was enacted. Thus, Congress, not the Executive, actually made the determination that Iraq would be subject to suit under the new FSIA exception, since Congress in enacting the statute knew that, regardless of what the Secretary of State might do in the future, the state sponsored terrorism exception would apply to an identifiable group of sovereign states of which Iraq was already a member. "No decision whatsoever of the Secretary of State was needed to create jurisdiction over [Iraq] .... That jurisdiction existed the moment that the AEDPA amendment became law." *Rein v. Socialist People's Libyan Arab Jamahiriya,* 162 F.3d at 764;

ceed in the courts of the United States. *See Foreign Terrorism and U.S. Courts: Hearings Before the Subcomm. on Courts and Admin. Practice of the Senate Comm. on the Judiciary,*

*Regarding S.825, the Foreign Sovereign Immunities Act,* 103d Cong. (June 21, 1994)., *available in* 1994 WL 274204 (F.D.C.H.) (statement of Chad Hall).

*see* H.R.Rep. No. 104–383, at 181–83 (1995), *available in* 1995 WL 731698.

### B. Equal Protection

 Defendant next argues that the state sponsored terrorism exception violates the equal protection guarantees of the Due Process Clause by discriminating between sovereign nations on the basis of their status as "sponsors of terrorism." *See* Def. Motion at 9. In order to demonstrate a violation of equal protection, Iraq must show not only that the statute makes distinctions, but that it makes distinctions on constitutionally impermissible grounds. While certain types of classifications, such as those based on race, are given strict scrutiny, *see, e.g., Hunt v. Cromartie,* 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Regents of University of California v. Bakke,* 438 U.S. 265, 290–91, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), a court will review other legislative classifications only to determine if they bear a rational relationship to the stated goal of the legislation. *See, e.g., F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988). The court simply examines the statute to see "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citing *Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). "Because no fundamental right is implicated by the [Secretary of State's] classification, the appropriate test is whether the statute is rationally related to a legitimate governmental purpose." *Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. at 331–31.

Here, the intent of Congress is abundantly clear. Concerned with acts of terrorism perpetrated against United States citizens abroad, Congress sought to provide a method whereby victims of such acts could seek redress in United States courts against such nations. *See* H.R.Rep. No. 104–383, at 181–83. The nations that Congress singled out are those that consistently operate outside the bounds of the international community by sponsoring and encouraging acts generally condemned by civilized nations. As Congress has noted:

> These outlaw states consider terrorism a legitimate instrument of achieving their foreign policy goals. They have become better at hiding their material support for their surrogates, which includes the provision of safe havens, funding, training, supplying weaponry, medical assistance, false travel documentation, and the like. For this reason, the Committee has determined that allowing suits in the federal courts against countries responsible for terrorist acts where Americans and/or their loved ones suffer injury or death at the hands of the terrorist states is warranted. [The state sponsored terrorism exception] will give American citizens an important economic and financial weapon against these outlaw states.

H.R.Rep. No. 104–383, at 182–83.

Those nations that operate in a manner inconsistent with international norms should not expect to be granted the privilege of immunity from suit that is within the prerogative of Congress to grant or withhold. The distinction made by Congress between those states that have been designated as sponsors of terrorism and those that have not is rationally related to its purpose of protecting U.S. citizens by deterring international terrorism and providing compensation for victims of terrorist acts. 28 U.S.C. § 1605(a)(7) does not violate the equal protection guarantees of the Due Process Clause.

### C. Personal Jurisdiction

 Defendant's final constitutional argument is that the state sponsored terrorism exception to the FSIA abrogates the minimum contacts requirement of due process necessary for the assertion of personal jurisdiction. *See* Def. Motion at 10–11.

Because all of the conduct alleged in the complaint occurred outside the borders of the United States, defendant argues that it had no "fair warning that a particular activity [would] subject [it] to the jurisdiction of a foreign sovereign," *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)), and that "maintenance of the suit [would] offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The Court disagrees.

Congress expressly addressed the minimum contacts requirement in enacting the FSIA by providing that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction" pursuant to the exceptions of the FSIA, and where service has been made. 28 U.S.C. § 1330(b); *see Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1020 (2d Cir.1991) ("Under the FSIA, therefore, personal jurisdiction equals subject matter jurisdiction plus valid service of process."). Indeed, Congress explicitly considered *International Shoe* before passing the original FSIA:

> [28 U.S.C. §] 1330(b) provides, in effect, a Federal long-arm statute over foreign states (including political subdivisions, agencies, and instrumentalities of foreign states). It is patterned after the long-arm statute Congress enacted for the District of Columbia. Public Law 91–358, sec. 132(a), title I, 84 Stat. 549. The requirements of minimum jurisdictional contacts and adequate notice are embodied in the provision. *Cf. International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). For personal jurisdiction to exist under section 1330(b), the claim must first of all be one over which the district courts have original jurisdiction under section 1330(a), meaning a claim for which the foreign state is not entitled to immunity. Significantly, each of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States, or an express or implied waiver by the foreign state of its immunity from jurisdiction. These immunity provisions, therefore, prescribe the necessary contacts which must exist before our courts can exercise personal jurisdiction. Besides incorporating these jurisdictional contacts by reference, section 1330(b) also satisfies the due process requirement of adequate notice by prescribing that proper service be made under section 1608 of the bill. Thus, sections 1330(b), 1608, and 1605–1607 are all carefully interconnected.

H.R.Rep. No. 94–1487, at 13–14 (1976) (footnotes omitted), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6612, *quoted in Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica,* 614 F.2d 1247, 1255 n. 5 (9th Cir.1980).

When it enacted the state sponsored terrorism exception in the AEDPA, however, Congress arguably changed the topology of the FSIA. Unlike other FSIA exceptions, the connection between the lawsuit and the United States may seem less obvious under 28 U.S.C. § 1605(a)(7). Yet the analytic inquiry remains the same: Have states that sponsor terrorism been given adequate warning that terrorist acts against United States citizens, no matter where they occur, may subject them to suit in a United States court? Have they been provided with that "degree of predictability ... that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit?" *Burger King Corp. v. Rudzewicz,* 471 U.S. at 472, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen Corp. v. Wood-*

*son,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In the context of this statute, the purpose for which it was enacted, and the nature of the activity toward which it is directed, the Court concludes that it is reasonable that foreign states be held accountable in the courts of the United States for terrorist actions perpetrated against U.S. citizens anywhere.

As Judge Lamberth has noted, "terrorism is . . . the modern era's *hosti humani generis*—an enemy of all mankind." *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 23. It has become the insidious method by which certain rogue states operate to influence the international community, outside the normal bounds of international communication. No nation openly professes to support the use of terrorist methods, though several clandestinely do. Although there are traditional methods of effecting change on the world stage—including diplomacy, trade and economic sanctions, and even the use of organized armed conflict under established international rules of war—certain states instead choose to conduct their policy through naked violence directed at individuals. In such circumstances, "traditional notions of fair play and substantial justice" are stretched to the limits. Yet, as Judge Lamberth has correctly concluded:

> All states are on notice that state sponsorship of terrorism is condemned by the international community. United States policy towards state sponsors of terrorists, has been made abundantly clear since the 1979–1981 hostage crisis in Tehran and the ensuing suspension of diplomatic relations with and establishment of international boycotts against foreign state sponsors of terrorism.

Foreign state sponsors of terrorism could not reasonably have expected that the United States would not respond to attacks on its citizens, and not undertake measures to prevent similar attacks in the future. In light of the mounting Congressional frustration at the inability of United States victims of foreign state abuses to obtain relief from any forum, it is manifest that Congress enacted 28 U.S.C. § 1605(a)(7) to ensure fair play and substantial justice for American victims of state sponsored terrorism. *Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 23. The state sponsored terrorism exception "provides an express jurisdictional nexus based upon the victim's United States nationality." *Id.* at 22.

▇ Plaintiffs allege that the purpose behind detaining Kenneth Beaty, David Daliberti and William Barloon was to prompt certain actions by the United States, particularly the lifting of economic sanctions against Iraq and the delivery of millions of dollars worth of humanitarian goods. Compl. ¶¶ 9, 14. Kenneth Beaty was released only after such goods were delivered from the United States. The detention of these three plaintiffs had a direct effect in the United States and was consciously designed to affect United States policy. Under the circumstances, Iraq cannot now claim surprise at the assertion of jurisdiction by this Court over claims brought in response to its actions. It is reasonable that Iraq be held to answer in a United States court for acts of terrorism against United States citizens.[7]

## IV. ACT OF STATE DOCTRINE

▇ Finally, Iraq moves to dismiss this action for failure to state a claim on

---

7. In a related argument, defendant moves to dismiss this action on grounds of *forum non conveniens,* suggesting that it would present an undue burden on Iraq to force it to defend itself in this forum. *See* Def. Motion at 28–29. Defendant's request must fail because Congress has explicitly authorized this action, and in doing so has already balanced the interests of the United States in hearing such a suit in the federal courts of this country against the interests of Iraq in not being forced to defend here. It would be inappropriate for this Court to second-guess Congress and apply its own balancing test where none is called for by the statute or manifest principles of constitutional law. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. at 25.

the grounds that adjudication of its conduct would violate the act of state doctrine. *See* Def. Motion at 25–27. This doctrine "directs United States courts to refrain from deciding a case when the outcome turns upon the legality or illegality ... of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Commissioner of IRS*, 163 F.3d 1363, 1367 (D.C.Cir.1999) (citing *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990)). It is rooted in the "domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics*, 493 U.S. at 404 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). The act of state doctrine is designed, at least in part, to avoid having the Judiciary "embarrass" the Executive and Legislative Branches, which are the branches constitutionally empowered to decide matters relating to foreign policy. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. at 421–24, 84 S.Ct. 923 (act of state derives from judicial concern with possible interference with the political branches' conduct of foreign affairs).

While the act of state doctrine seeks to prevent courts from interfering in the foreign affairs powers of the President and the Congress, it does not prohibit Congress and the Executive from using the threat of legal action in the courts as an instrument of foreign policy. The designation of Iraq as a terrorist state was made by the Secretary of State on behalf of the Executive Branch under an express grant of authority by Congress. For this Court to grant defendant's motion to dismiss on act of state grounds would constitute more of a judicial interference in the announced foreign policy of the political branches of government than to allow the suit to proceed under the explicit authorization of Congress.

## V. CONCLUSION

The four male plaintiffs have established sufficient grounds to allow their claims to proceed under the state sponsored terrorism exception to the FSIA, 28 U.S.C. § 1605(a)(7). The claims of the spouse plaintiffs and all other claims brought under the commercial activity exception, 28 U.S.C. § 1605(a)(2), will be dismissed for lack of subject matter jurisdiction. The Court has personal jurisdiction under the FSIA. The state sponsored terrorism exception is not unconstitutional as applied to the defendant. Finally, the act of state doctrine is no bar to this suit. Defendant's motion to dismiss therefore will be denied. Iraq must file an answer and the case will proceed to discovery and trial.

An appropriate Order will issue this same day.

## *ORDER*

Upon consideration of defendant's motion to dismiss, and for the reasons stated in a separate Opinion issued this same day, it is hereby

ORDERED that defendant's motion to dismiss [22–1] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that defendant's motion is GRANTED with respect to plaintiffs Kathy Daliberti, Robin Beaty, Elizabeth N. Hall and Linda Barloon's claims for relief under the waiver exception or the commercial activity exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(1), (2). These plaintiffs and their claims are dismissed from this case without prejudice; and it is

FURTHER ORDERED that defendant's motion is DENIED with respect to plaintiffs David Daliberti, Kenneth Beaty, Clinton Adam Hall and William Barloon's claims under the state sponsored terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7). These

plaintiffs and their claims survive defendant's motion; and it is

FURTHER ORDERED that defendant is ordered to answer plaintiff's complaint on or before July 31, 2000.

SO ORDERED