103 F.3d 789
 96 Cal. Daily Op. Serv. 9101, 96 Daily Journal
D.A.R. 15,080
Maximo HILAO, Class Plaintiffs, Plaintiff,
and
Jose Maria Sison; Jaime Piopongco; Ramon Sison, Dr.;
Estate of Francisco Sison; Estate of Florentina
Sison; Estate of Amelia Sison,
Plaintiffs-Appellants,
v.
ESTATE OF Ferdinand MARCOS, Defendant-Appellee.
 No. 95-16779.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 18, 1996.
Decided Dec. 17, 1996.
 
 Paul F. Hoffman, ACLU Foundation of Southern California, Los Angeles, California, for plaintiffs-appellants.
 B.J. Rothbaum, Linn & Neville, Oklahoma City, Oklahoma, for defendant-appellee.
 Constance de la Vega, University of San Francisco Law Clinic, San Francisco, CA, on behalf of Amicus Human Rights Advocates.
 Steven M. Schneebaum, Patton & Boggs, L.L.P., Washington, DC, on behalf of Amicus International Human Rights Law Group.
 Appeal from the United States District Court for the District of Hawaii, Manuel L. Real, District Judge, Presiding. D.C. No. MDL-840.
 Before: FLETCHER, PREGERSON and RYMER, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Jose Maria Sison and Jaime Piopongco appeal from various rulings of the district court in the trial of their claims against the Estate of Ferdinand E. Marcos for damages incurred when human-rights abuses were inflicted upon them in the Philippines during Marcos' tenure as president. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and we affirm in part and reverse in part.
 
 FACTUAL BACKGROUND
 
 2
 The general factual background of the human-rights abuses committed in the Philippines during the Marcos era is discussed by the district court in In re Estate of Ferdinand E. Marcos Human Rights Litigation, 910 F.Supp. 1460, 1462-63 (D.Haw.1995).
 
 
 3
 Sison, a leading opponent of the Marcos regime, was arrested in 1977 and interrogated personally by Marcos. He was then interrogated by members of the military, who blindfolded and severely beat him while he was handcuffed and fettered; they also threatened him with death. When this round of interrogation ended, he was denied sleep and repeatedly threatened with death. In the next round of interrogation, all of his limbs were shackled to a cot and a towel was placed over his nose and mouth; his interrogators then poured water down his nostrils so that he felt as though he were drowning. This lasted for approximately six hours, during which time the interrogators threatened Sison with electric shock and death. At the end of this water torture, Sison was left shackled to the cot for the following three days, during which time he was repeatedly interrogated. He was then imprisoned for seven months in a suffocatingly hot and unlit cell, measuring 2.5 meters square; during this period he was shackled to his cot, at first by all his limbs and later by one hand and one foot, for all but the briefest periods (in which he was allowed to eat or use the toilet). The handcuffs were often so tight that the slightest movement by Sison made them cut into his flesh. During this period, he felt "extreme pain, almost undescribable, the boredom" and "the feeling that tons of lead ... were falling on [his] brain". Sison was never told how long the treatment inflicted upon him would last. After his seven months shackled to his cot, Sison spent more than eight years in detention, approximately five of them in solitary confinement and the rest in near-solitary confinement.
 
 
 4
 Piopongco, a politically active owner of a radio station, had his home searched and his radio station closed immediately after the declaration of martial law in 1972. He went into hiding, but was arrested in November 1972. After his initial detention, he was taken to the presidential palace were he was held incommunicado, interrogated by high-ranking military officers, and subjected to mock executions. After his transfer back to his original detention center, he was threatened with death. In late December 1972, he was released, but the following day he was told that his release had been countermanded by Marcos and he was placed under house arrest. He remained under armed surveillance at home for over four years, until he managed to escape to the U.S. He was required to report weekly to the military, during which reports he was threatened. He had to feed and house his warders in his home, and as a result was shunned by his friends and associates.
 
 PROCEDURAL HISTORY
 
 5
 Sison and Piopongco, among others, filed suit against Marcos in 1986 when the former Philippine ruler fled to Hawaii. The dismissal of these cases by the district court on the basis of the "act of state" doctrine was reversed by this court in Trajano v. Marcos, 878 F.2d 1439 (9th Cir.1989) (mem.). All pending suits against Marcos for human-rights abuses were, by order of the Judicial Panel on Multidistrict Litigation, consolidated in Hawaii. One of the suits, Hilao v. Marcos, was certified as a class action, but several plaintiffs, including Sison and Piopongco, continued to pursue their claims directly. When Marcos died, his wife and son, as representatives of his estate, were substituted as defendants.
 
 
 6
 At the request of the class plaintiffs, the trial was trifurcated into liability, exemplary-damage, and compensatory-damage phases. The Estate's liability to the class members and the direct plaintiffs was tried at the same time in September 1992. Sison testified by videotaped deposition about the human-rights abuses inflicted upon him. Verdicts against the Estate were returned for all but one plaintiff; the Estate was found liable to both Sison and Piopongco.
 
 
 7
 In February 1994, a trial on exemplary damages was held; the only additional evidence presented was on the Estate's assets. The jury returned a verdict of $1.2 billion against the Estate; the district court ruled that this was an aggregate award to be divided pro rata among all the plaintiffs, both class and direct.
 
 
 8
 In January 1995, trials on compensatory damages were held. The class and direct plaintiffs' claims were tried separately. The jury awarded over $750,000,000 in damages to the class plaintiffs, who numbered nearly 10,000. In the compensatory-damage trial for the direct plaintiffs, the district court sua sponte refused to allow Sison's claim to go to the jury; the court denied Sison's motion to reopen to reintroduce his previous testimony and later denied his motion for a new trial. The jury returned a verdict awarding compensatory damages for pain and suffering to all 21 of the direct plaintiffs whose cases were submitted to it. Piopongco was awarded $175,000.
 
 
 9
 In April 1995, the district court imposed remittitur on most of the direct plaintiffs' awards, requiring them to accept reduced compensatory-damage awards in order to avoid its granting the Estate's motion for a new trial. Piopongco accepted the reduction of his award to $75,000.
 
 JURISDICTION
 
 10
 The district court had jurisdiction over this case under the Alien Tort Claims Act, 28 U.S.C. § 1350. See Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation), 978 F.2d 493, 501-03 (9th Cir.1992) ("Estate I "), cert. denied, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993); Hilao v. Marcos (In re Estate of Ferdinand E. Marcos, Human Rights Litigation), 25 F.3d 1467, 1472-74 (9th Cir.1994) ("Estate II "), cert. denied, --- U.S. ----, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995). The district court also had diversity jurisdiction over Piopongco's claims under 28 U.S.C. § 1332 as well, since Piopongco is a U.S. citizen and a resident of California and Ferdinand Marcos was a Philippine citizen and was resident in Hawaii.
 
 DISCUSSION
 I. Sison's Damages Claim
 
 11
 In his opening statement at the compensatory-damage phase of the trial, Sison's counsel told the jury that Sison would rely on the evidence presented at the liability phase of the trial. He reminded the jury that Sison and his wife had testified by videotaped deposition and briefly outlined the facts of Sison's torture, telling the jury that he would review those facts in more detail in closing argument. Witnesses appeared for the other direct plaintiffs; their testimony consisted largely of recounting the abuses inflicted on them, though some questions were directed to the issue of any earnings they lost. After the plaintiffs rested their case, the defendants offered no evidence.
 
 
 12
 The district court then discussed the verdict form with the attorneys. In doing so, the court stated that it had no evidence for Sison and would therefore not present Sison's claim to the jury. Sison's counsel pointed out that Sison's testimony had been taken in the liability phase of the trial, and that the court's jury instructions would tell the jury to consider all evidence from the liability phase in reaching its compensatory-damage verdicts. The court responded first that liability and damage evidence was different and second that the defendants had not had an opportunity to cross-examine Sison on damages. Despite strenuous argument by Sison's counsel, the court refused to present Sison's claim to the jury. Sison's counsel then moved to reopen the testimony in order to reintroduce Sison's liability-phase testimony; the court denied the motion.[1] The court insisted that the jury's finding in the liability phase was relevant only to liability and not damages; it concluded, "Now, some people can be tortured and not have any damage at all".
 
 
 13
 The district court appears to have sua sponte granted judgment as a matter of law in favor of the Estate on Sison's damage claim. A grant of judgment as a matter of law is reviewed de novo and is proper when the evidence only allows one reasonable conclusion. Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir.1994).
 
 
 14
 Federal Rule of Civil Procedure 50(a)(1) appears to contemplate the entry of judgment as a matter of law during a trial only upon a motion by a party. But see Peterson v. Peterson, 400 F.2d 336, 343 (8th Cir.1968) (affirming a sua sponte directed verdict on special interrogatory). Even if we assume, without deciding, that the district court had the power to grant a directed verdict sua sponte, the grant in this case was in error.
 
 
 15
 Sison had testified in the liability phase of the trial as to the human-rights abuses inflicted on him, and the jury found Marcos liable for the torture of Sison. The jury instructions in the liability phase had defined torture, in relevant part, as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ... whether physical or mental, is intentionally inflicted on that individual".[2] Thus, as a matter of law, evidence sufficient to support the jury's finding of the Estate's liability for torture constitutes evidence sufficient to support an award of damages for pain and suffering to Sison.[3] In this case, Sison was seeking only damages for pain and suffering, having waived any claim to special damages (such as for medical costs, lost wages, etc.).
 
 
 16
 In addition, the jury was entitled to consider the evidence admitted at the liability phase in reaching its compensatory-damage verdicts. At the compensatory-damage phase, the court instructed the jury as follows: "You should consider all evidence from the trial on liability, as well as evidence you have heard during the compensatory damage phase of the direct action case."[4] This instruction appears to have been entirely proper, since the separate phases of the trial were indeed phases of a single trial held before a single jury.
 
 
 17
 We reverse the district court's refusal to submit Sison's claim for compensatory damages to the jury and remand for further proceedings on compensatory damages. We therefore decline to reach Sison's arguments on the district court's refusal to reopen the trial, its denial of Sison's motion for a new trial, and its denial of his motion for an award of nominal damages.[5]
 
 II. Piopongco's State-Law Claims
 
 18
 After the presentation of the evidence in the liability phase of the trial, the district court refused Piopongco's proposed jury instructions on several claims, including assault and battery, intentional infliction of emotional distress, and intentional destruction of business property. The court appears to have rejected the claims because they were not "covered by international law"; it also stated in connection with the property claim that it would not instruct the jury
 
 
 19
 because I think it's too vague and, certainly, it would be injecting this Court into the everyday elements of what was going on in the Philippines. We would have to then review the question of the actions of the Commission, to which at least Mrs. Piopongco had made application for restoration of the property, and just I think that that's doing too much for that.
 
 
 20
 The district court's refusal to instruct the jury on these claims appears to have been a dismissal of the claims for lack of jurisdiction, given the reference to the claims not being under international law, though it might also be considered a grant of judgment as a matter of law for the Estate on these claims. In either case, we review the district court's actions de novo. Valdez v. United States, 56 F.3d 1177, 1179 (9th Cir.1995) (subject-matter jurisdiction); Berry, 39 F.3d at 1057 (judgment as a matter of law).
 
 
 21
 The Alien Tort Claims Act does grant a district court jurisdiction only of torts committed in violation of international law. 28 U.S.C. § 1350. The district court, however, appears to have had subject-matter jurisdiction over Piopongco's non-international-law claims[6] on the basis of diversity. Section 1332(a)(2) provides for jurisdiction over suits between "citizens of a State and citizens or subjects of a foreign state". Piopongco is a U.S. citizen and a California resident; Marcos was a Philippine citizen and was resident in Hawaii at the time of the suit. Thus, to the extent that the district court dismissed these claims for lack of subject-matter jurisdiction, the dismissal appears to have been in error.
 
 
 22
 The district court's error as to the claim for assault and battery may have been of no consequence, since it appears that the acts for which a jury could find the Estate liable for assault and battery are the same acts for which the jury did in fact find the Estate liable for torture. As to the claim for intentional infliction of emotional distress, the evidence concerning Piopongco's four years of house arrest appears to constitute prolonged arbitrary detention, on which the jury was also instructed. The claim for destruction of Piopongco's radio station, however, is entirely distinct from any claim for torture or for prolonged arbitrary detention and therefore the error in not letting this claim go to the jury prejudiced Piopongco. We therefore reverse the district court and remand for further proceedings on Piopongco's claim for destruction of property.
 
 III. Cruel, Inhuman or Degrading Treatment
 
 23
 The district court refused to instruct the jury on Sison's and Piopongco's claims for cruel, inhuman, or degrading treatment because it said that standard for such a claim was "too vague".
 
 
 24
 Again, although it is not entirely clear as a formal, procedural matter what the district court did, it appears to have dismissed the claim for lack of subject-matter jurisdiction. The Alien Tort Claims Act grants jurisdiction over torts in violation of international law, and this court has held, in a prior decision in this litigation, that "[a]ctionable violations of international law [under § 1350] must be of a norm that is specific, universal, and obligatory". Estate II, 25 F.3d at 1475 (emphasis added). The district court's refusal to instruct the jury on this claim appears to have been a decision that the international-law norm against cruel, inhuman, and degrading treatment is not sufficiently specific such that violations of that norm are actionable under § 1350. That decision is a question of law, and we review such questions de novo. Twenty-Three Nineteen Creekside, Inc. v. Commissioner, 59 F.3d 130, 131 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996).
 
 
 25
 We determine the content of international law by reference "to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators". Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 715 (9th Cir.1992) (quoting The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900)). Cruel, inhuman, and degrading treatment is prohibited by Article 5 of the Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. GAOR, 3d Sess., Supp. No. 1, U.N. Doc. A/810 (1948); by Article 7 of the International Covenant on Civil and Political Rights,[7] Dec. 19, 1966, 999 U.N.T.S. 171, 175; by Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[8] Dec. 10, 1984, 23 I.L.M. 1027, 1031 (1984), as modified, 24 I.L.M. 535 (9185); by Article 5(2) of the American Convention on Human Rights, Nov. 22, 1969, 9 I.L.M. 673, 676; by Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 222, 224; and by Article 5 of the African Charter on Human and Peoples' Rights, June 27, 1981, 21 I.L.M. 58, 60. These documents consistently link such treatment to torture, which this court has held is prohibited not only by a specific, universal, and obligatory norm but by one that reaches the level of jus cogens. Siderman de Blake, 965 F.2d at 714-717. Indeed, the international conventions or declarations banning such treatment indicate that "[t]orture constitutes an aggravated and deliberate form of cruel inhuman or degrading treatment or punishment."
 
 
 26
 Although the district court did not instruct on a theory of "cruel, inhuman, or degrading" treatment, it did instruct that the Estate could be found liable for torture or arbitrary detention. Because this comprises all the conduct alleged by Sison and Piopongco, we need not decide whether the proscription against "cruel, inhuman, or degrading" treatment is sufficiently specific to allow a suit for its violation under § 1350 or what, apart from torture and arbitrary detention, which are recognized as actionable violations of international law, it might consist of.
 
 
 27
 The jury was instructed that it could find the Estate liable if Marcos had knowledge that the military caused the torture or arbitrary detention of the plaintiffs and failed to use his power to attempt to prevent the torture or detention.[9] The district court's instruction on the definition of torture is set forth in relevant part in Section I, above; as to "[p]rolonged arbitrary detention", the district court instructed the jury that the term meant "detention of a person in an official detention facility or any other place without any notice of the charges and failure to bring to trial that person within a reasonable time ... consider[ing] all of the circumstances existing in the Philippines at the time of the detention". The correctness of the substantive instructions that were given is not an issue on appeal.
 
 
 28
 In the case of Sison, it seems clear that all of the abuses to which he testified--including the eight years during which he was held in solitary or near-solitary confinement--constituted a single course of conduct of torture. To the extent Sison's years in solitary confinement do not constitute torture, they clearly meet the definition of prolonged arbitrary detention as instructed by the district court. As for Piopongco, the acts committed against him during his detention in 1972 clearly come within the definition of torture. In addition, his several years of house arrest with no charges ever filed against him clearly come within the definition of prolonged arbitrary detention. Because all of the abuses alleged by Sison and Piopongco constituted either torture or prolonged arbitrary detention, and because the jury, properly instructed on torture and arbitrary detention, found the Estate liable for the abuses committed against Sison and Piopongco, the refusal of the district court to allow appellants' claims of cruel, inhuman, or degrading treatment to go to the jury worked no prejudice against Sison and Piopongco. We therefore need not decide whether the international-law norm against cruel, inhuman, or degrading treatment is sufficiently specific to allow suits for its violation under the Alien Tort Claims Act.
 
 CONCLUSION
 
 29
 We reverse the district court's refusal to submit Sison's compensatory-damage claim to the jury and remand for further proceedings on that claim and we reverse the district court's refusal to allow the jury to consider Piopongco's state-law claims of destruction of business property. We decline to reach the appellants' claim that the district court erred in refusing to allow the jury to consider their claims for cruel, inhuman, and degrading punishment.
 
 
 30
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 [1]
 The court appears to have stated that it would have allowed reopening if counsel could have presented Sison's evidence in the same form as it had been presented in the liability phase, i.e., by the same edited videotape; that appears not to have been possible because the videotape had apparently been sent to this court as part of the record in connection with the appeal of the Republic of the Philippines from the district court's preliminary injunction
 
 
 [2]
 This definition tracks those given in the Torture Victim Protection Act, 28 U.S.C. § 1350, note § 3(b)(1), and in Article I of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027 (1984), as modified, 24 I.L.M. 535 (1985)
 
 
 [3]
 The district court's instructions made clear that no other evidence was required for the jury to award damages for pain and suffering: "No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for pain and suffering, nor is the opinion of any witness required as to the amount of such reasonable compensation." (Emphasis added.) Instead, the jurors were instructed to use "calm and reasonable judgment" and fix damages that would be "just and reasonable in light of the evidence and your experience"
 
 
 [4]
 When Sison's counsel pointed out this proposed instruction to the district court in arguing against the district court's refusal to submit Sison's claim to the jury, the district court said, "Well, I won't give that instruction that [sic] all evidence because that's not true. Only the evidence that refers and is relevant to damages." Despite this statement, the district court did give the instruction
 
 
 [5]
 Sison had moved for $1.00 in nominal damages so that he would be entitled to a pro rata share of the exemplary-damage award against the Estate. If the jury awards compensatory damages to Sison on remand, he would then also be entitled to his pro rata share of the exemplary damage award as provided in the final judgment in the direct action cases
 
 
 [6]
 The source of law for these claims is not entirely clear. No source is identified in Piopongco's complaint. The jury instruction on emotional distress cites as sources both U.S. model jury instructions and a treatise on Philippine tort law. The instruction on destruction of property cites only to the Philippine Civil Code, while the instruction on assault and battery cites only to federal model instructions
 
 
 [7]
 The U.S. Senate ratified the Covenant in 1992, 138 Cong. Rec. S4781, S4783-4 (daily ed. April 2, 1992), and the Covenant entered into force for the United States in September of that year
 
 
 [8]
 The U.S. Senate ratified the Convention in 1990, 136 Cong. Rec. S10091, S10093 (July 19, 1990), the instrument of ratification was deposited with the U.N. in October 1994, and the Convention entered into force for the United States in November 1994
 
 
 [9]
 Customary international human-rights law prohibits prolonged arbitrary detention. Restatement (Third) of Foreign Relations Law § 702(e)