**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MIRANDA DITULLIO,
        *Plaintiff-Appellant,*

v.

JOSEF F. BOEHM,
        *Defendant-Appellee.*

No. 10-36012

D.C. No.
3:09-cv-00113-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
July 25, 2011—Anchorage, Alaska

Filed November 7, 2011

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge B. Fletcher;
Dissent by Judge Callahan

**COUNSEL**

Darryl L. Jones, Law Office of Darryl Jones, Anchorage, Alaska, for the plaintiff-appellant.

W. Sherman Ernouf, Law Offices of Ernouf and Coffey, P.C., Anchorage, Alaska, for the defendant-appellee.

**OPINION**

B. FLETCHER:

In November 2004, appellee Josef Boehm pled guilty to one count of conspiracy to engage in human trafficking, and admitted that between 2001 and December 22, 2003, he conspired with others to provide controlled substances to several minors and recruited them to engage in sexual activity. Appellant Miranda Ditullio alleges that she is one of the victims identified in Boehm's plea agreement and seeks compensatory and punitive damages under the Trafficking Victims Protection Act, 18 U.S.C. § 1589 et seq. (hereinafter "TVPA"). Ditullio's complaint requests compensatory damages in excess of $5 million, punitive damages of up to $20 million, interests, costs, and attorney's fees.

After denying Ditullio's motion for summary judgment, and Boehm's motion to dismiss for failure to state a claim, the district court certified an interlocutory appeal on two questions of first impression: (1) whether the TVPA permits recovery of punitive damages, and (2) whether the TVPA's

civil action provision, 18 U.S.C. § 1595 (which became effective on December 19, 2003), applies retroactively to conduct occurring before its effective date, particularly when the perpetrator may have engaged in sex trafficking after the statute's effective date. We hold that the TVPA permits recovery of punitive damages because it creates a cause of action that sounds in tort and punitive damages are available in tort actions under the common law. We also hold that 18 U.S.C. § 1595 cannot be applied retroactively to conduct that occurred before its effective date.

I.

When it enacted the Trafficking Victims Protection Act in 2000, Congress declared that the purposes of the TVPA are to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." Pub. L. No. 106-386, § 102, 114 Stat. 1488 (2000) (codified as amended at 18 U.S.C. § 1589 et seq.). As relevant here, the TVPA makes it a federal crime to knowingly:

> recruit[ ], entice[ ], harbor[ ], transport[ ], provide[ ], obtain[ ] or maintain[ ] by any means a person . . . knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act.

18 U.S.C. § 1591(a). In 2003, Congress reauthorized appropriations for the TVPA and amended it in order to "enhanc[e] provisions on prevention of trafficking, protection of victims of trafficking, and prosecution of traffickers." H.R. Rep. No. 108-264 (I), at 8 (2003). In particular, Congress created a private right of civil action for victims of trafficking. 18 U.S.C. § 1595 (hereinafter "§ 1595" or "civil remedy provision"). The civil remedy provision currently provides:

> An individual who is a victim of a violation may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).[1] Section 1595 became effective on December 19, 2003. *See* Pub. L. 108-193, 117 Stat. 2878 (2003) (codified as amended at 18 U.S.C. § 1589 et seq.).

## II.

In November 2004, Boehm pled guilty to one count of conspiracy to commit sex trafficking of children in violation of 18 U.S.C. §§ 371[2] and 1591(a)(1) and one count of conspiracy to distribute controlled substances to persons under twenty-one years old, in violation of 21 U.S.C. §§ 846, 841(a)(1). Boehm specifically admitted the truth of the allegations contained in the factual basis for his pleas, including the following:

> Beginning in late 2001 and *continuing until December 22, 2003, BOEHM conspired* with BOLLING, WILLIAMS, and TYREE *to recruit persons under 18 ("juveniles") to engage in sexual acts*. The juve-

---

[1] The version of § 1595 enacted in 2003 limited the civil remedy to victims of three specific trafficking acts (including sex trafficking of minors), and did not expressly permit recovery against individuals who benefit from participation in a trafficking venture. *See* Pub. L. 108-193, § 4(a)(4)(A), 117 Stat. 2878 (2003). In the TVPA's 2008 reauthorization, Congress deleted those limitations. *See* Pub. L. 110-457, Title II, § 221(2), 122 Stat. 5067 (2008). Those changes do not affect the disposition of this case.

[2] 18 U.S.C. § 371 makes it a crime to engage in a conspiracy to commit an offense against the United States.

niles were recruited by offering them cocaine, which was manufactured outside of Alaska and effected interstate commerce. *The following juveniles were knowingly recruited by the defendants to engage in sex:* S.P., E.A., J.M., K.W., L.H., C.R., L.B., and *M.D.* These juveniles had sex with one or more of the defendants, and received money and/or controlled substances from the defendants. The defendants knew the juveniles ages when they recruited the juveniles. To effect the purposes of the conspiracy, the defendant purchased cocaine and distributed cocaine to one or more juveniles, including S.P. in or about the fall of 2001.

(emphasis added).

Ditullio filed suit in federal district court in June 2009, and amended her complaint in October 2009. She alleged involuntary servitude in violation of the Thirteenth Amendment, violations of the TVPA, sexual assault, and intentional infliction of emotional distress. Ditullio moved for summary judgment on Boehm's liability for compensatory and punitive damages. She attached to the motion a copy of Boehm's 2004 plea agreement and an affidavit.

Ditullio declared that she is the victim identified by the initials "M.D." in Boehm's plea agreement. She claims to have first met Boehm in the fall of 2002 when she was fifteen years old. Ditullio claims that Boehm gave her crack cocaine "on a daily basis so that Mr. Boehm could have his way with me at any given time" and that she lived with him in order to obtain drugs on a regular basis. She declares that Boehm enticed her with drugs to perform sexual acts on others, including his coconspirators and other female victims. Ditullio also claims that she became pregnant in 2003, and that Boehm could be the father of the child (who was taken into state custody due to Ditullio's drug addiction). Ditullio states that she "suffered severe emotional upset" and has been unable to maintain

steady employment as a result of Boehm's actions. In reply, Boehm generally denied Ditullio's allegations and argued that her affidavit should be stricken, but offered no contradictory evidence.

The district court denied Ditullio's motion for partial summary judgment, despite its acknowledgment that the affidavit and plea agreement together established that Ditullio was a victim of sex trafficking and Boehm was the perpetrator. The district court concluded that "because § 1595 imposed a new form of civil damages on defendants who violated § 1591 and Congress did not indicate that it intended § 1595 to apply retroactively, the presumption against retroactivity applies." (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 269 (1994)). The district court stated that "there is no evidence on the record showing that Ditullio was a victim of Boehm's sex trafficking after December 19, 2003," although the plea agreement established that Boehm and his co-conspirators engaged in sex trafficking until "at least December 22, 2003." Accordingly, Ditullio was not entitled to summary judgment on the liability issue. The district court also rejected Ditullio's motion for summary judgment on her claim for punitive damages, stating that "Ditullio fails to cite any authority for the proposition that punitive damages are available under 18 U.S.C. § 1595(a), and if so, what legal standard applies."

Boehm then moved to dismiss under Federal Rule of Civil Procedure 12(c) and Ditullio moved for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The district court denied the 12(c) motion, but granted the motion for an interlocutory appeal, reasoning that the fact that Boehm's sex trafficking "did extend beyond December 19, 2003 . . . yields an interesting and genuinely debatable legal issue over whether in these circumstances the statute can be used to sweep in acts in the course of Boehm's conduct which took place prior to December 2003." Ditullio appeals the district court's rulings that section 1595 does not permit recovery of punitive damages and that section 1595 of the TVPA does not apply retro-

actively to conduct that occurred prior to the date it became effective.

The district court granted Ditullio's motion to certify these issues of first impression for interlocutory appeal. We have jurisdiction under 28 U.S.C. § 1292(b).

The availability of punitive damages is reviewed de novo. *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1013 (9th Cir. 2004). Whether a statute may be applied retroactively is a question of law that is reviewed de novo. *Saravia-Paguada v. Gonzales*, 488 F.3d 1122, 1129 n.10 (9th Cir. 2007).

## III.

**[1]** The district court concluded, without analysis, that punitive damages are not available under the TVPA. The TVPA's civil remedy provision provides that a victim "may recover damages and reasonable attorneys fees" in a civil action against the perpetrator. 18 U.S.C. § 1595. Standing alone, the term "damages" is ambiguous: it could refer to compensatory damages, punitive damages, nominal damages, or some combination of the three.[3] *Black's Law Dictionary* 445-48 (9th ed. 2009) (defining damages as "money claimed by, or ordered to be paid to, a person as compensation for loss

---

[3]The dissent mis-characterizes our conclusion that the term damages is ambiguous by stating that we find the statute is "silent" as to whether punitive damages are available. Our conclusion that the term "damages," standing alone, permits an award of punitive damages is supported by this court's precedent. The Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, provides victims of torture with a civil action for "damages." This court has affirmed awards of punitive and compensatory damages under the Torture Victim Protection Act of 1991. *See Hilao v. Estate of Marcos*, 103 F.3d 789, 791, 793 n.5 (9th Cir. 1996). Federal district courts have routinely awarded punitive damages under the Torture Victim Protection Act of 1991. *See, e.g.*, *Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355 (S.D. Fla. 2008); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004); *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995).

or injury" but noting that damages may be compensatory or punitive). Ditullio argues that compensatory and punitive damages are available under the statute. She points to the legislative history of the TVPA and to cases awarding punitive damages for violations of 42 U.S.C. § 1983. Because the TVPA civil remedy provision creates a cause of action that sounds in tort, we hold that punitive damages are available.

In *Franklin v. Gwinnett County Public Schools*, the Supreme Court held that money damages are available in a civil action brought under Title IX. 503 U.S. 60, 62-63 (1992). The plaintiff in *Franklin* alleged that she had been sexually harassed by a high school teacher. *Id.* at 63. The Court reasoned, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 70-71.

**[2]** In tort cases, punitive damages are "awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Restatement (Second) of Torts* § 908 (1979). Punitive damages may be awarded despite the defendant's prior criminal conviction for the same conduct. *Id.* cmt. a. Indeed, punitive damages are warranted when the defendant is found liable for "conduct involving some element of outrage similar to that usually found in crime." *Id.* cmt. b. The Supreme Court has long recognized that the common law provides for punitive damages in tort actions. "It is a well established principle of the common law . . . that in . . . all actions on the case for torts, a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant." *Barry v. Edmunds*, 116 U.S. 550, 562 (1886) (internal citation omitted).

**[3]** The Supreme Court has looked to the common law to determine the remedies available under federal statutes creating causes of action sounding in tort. The Court has applied common law principles and found that punitive damages are

available under 42 U.S.C. § 1983. Section 1983 makes individuals acting under color of law liable for deprivations of another's federally secured rights. *Id.* Section 1983 does not use the word damages, instead it provides that a violator "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." *Id.*

Looking to the common law, the Supreme Court concluded that punitive damages are available in actions under § 1983 in *Smith v. Wade*, 461 U.S. 30 (1983). Smith was a guard at a Missouri juvenile corrections facility. *Id.* at 32. Wade, an inmate at the facility, alleged that Smith violated the Eighth Amendment when he placed Wade in a cell with other inmates who harassed, beat and sexually assaulted him. *Id.* Wade obtained a jury verdict of $25,000 in compensatory damages and $5,000 in punitive damages. *Id.* at 33. Smith appealed the award of punitive damages arguing that they were improper absent a showing of intentional misconduct. *Id.* at 33, 37. The Court stated that "although the precise issue of the availability of punitive damages under § 1983 has never come squarely before us, we have had occasion more than once to make clear our view that they are available." *Id.* at 35. Explaining its analysis in prior cases, the Court noted the limited legislative history for § 1983 and said "In the absence of more specific guidance, *we look first to the common law of torts* . . . with such modification or adaption as might be necessary to carry out the purpose and policy of the statute." *Id.* at 34 (emphasis added).

The Court also explained that the common law of torts "provide[s] the appropriate starting point for the [damages] inquiry under § 1983 in *Carey v. Piphus*, 435 U.S. 247, 257-58 (1978). *See also Hague v. Comm. for Indus. Org.*, 101 F.2d 774, 789 (3d Cir. 1939) *modified on other grounds* 307 U.S. 496 (1939) (action for loss of political rights "sounds in tort and the jury may award exemplary or punitive damages"). Similarly, in *Basista v. Weir*, the Third Circuit explained that in a § 1983 action, "the federal common law of damages com-

mands the issue of damages.'"[4] 340 F.2d 74, 87 (3d Cir. 1965). The plaintiff in *Basista* alleged that police officers had violated his civil rights in numerous ways during an arrest and detention. *Id.* at 79-80. The court in *Basista* concluded that the common law, which permits punitive damages, governs damages under the Civil Rights Act in part because uniformity is necessary to "effect the purposes and ends which Congress intended." *Id.* at 86. The court found the alternative, applying state law to determine damages under section 1983, unacceptable. *Id.*

**[4]** As the Supreme Court has done to determine the scope of remedies available under federal statutes, we turn to common law principles to determine whether punitive damages are available under the TVPA civil action provision. We follow the "general rule" that we should award "any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. at 71. Punitive damages are generally appropriate under the TVPA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous. A plaintiff bringing a civil action under the TVPA must prove that the defendant has engaged in human trafficking, which Congress described as "a contemporary manifestation of slavery." Pub.

---

[4]We are mindful of the Supreme Court's admonition that federal courts are not authorized to "derive 'general' common law." *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 729 (2004) (citing *Erie Ry. Co. v. Tompkins*, 304 U.S. 64 (1938)). The Court has distinguished use of the common law to "do no more than identify the scope of the remedy Congress itself has provided" from the impermissible invocation of "some broad-ranging common-law source for creating a cause of action." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 645-46 (1981).

We also note that the Supreme Court has held that punitive damages are not available under statutes enacted under Congress' Spending Clause powers, unless the statute expressly provides for punitive damages. *See Barnes v. Gorman*, 536 U.S. 181, 186-90 (2002). *Barnes* is inapplicable to the TVPA, which Congress enacted under its Commerce Clause powers. *See* 18 U.S.C. § 1591(a); H.R. Rep. No. 108-264(I), at 14 (2003).

L. No. 106-386, § 102, 114 Stat. 1488 (2000) (codified as amended at 18 U.S.C. § 1589 et seq.). Such conduct obviously meets the common law standards for award of punitive damages because it is both intentional and outrageous. Moreover, permitting punitive damages is consistent with Congress' purposes in enacting the TVPA, which include increased protection for victims of trafficking and punishment of traffickers. We therefore hold that punitive damages are available under 18 U.S.C. § 1595.[5] Ditullio should be permitted to present her case for such damages before a jury.

## IV.

Ditullio seeks to apply § 1595 to conduct that straddles its December 19, 2003 effective date. While the bulk of the conduct for which she seeks damages occurred before December 19, 2003, she alleges the conduct continued at least until Boehm's arrest on December 22, 2003. Ditullio argues that the TVPA's civil remedy provision can be applied retroactively to conduct before December 19, 2003.

**[5]** The Supreme Court has recognized a "time honored

---

[5]The dissent turns to the legislative history of the TVPA and reaches the opposite result. The dissent emphasizes that a previous draft of the TVPA provided for "actual damages, punitive damages, reasonable attorney's fees and other litigation costs reasonably incurred" but the statute as enacted provides only for "damages and reasonable attorney's fees." Dissent at 20072-73. The legislative history is not as clear as the dissent suggests; Congress did not simply remove the phrase "punitive damages" from the TVPA, instead it replaced the terms "actual damages and punitive damages" with the more general term "damages." Neither the significance of this change nor the reason for it appear in the legislative history. The dissent posits that the change may have been the result of a DOJ letter arguing to eliminate the entire civil action provision. Whatever weight Congress may have given the letter, Congress ultimately did not agree with the DOJ because it did not remove the civil action provision from the final bill. Neither the text of the TVPA, nor its legislative history, resolve the question of availability of punitive damages; Congress may have intentionally left this question to the Courts.

presumption [that] unless Congress has clearly manifested its intent to the contrary," "the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place." *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 946 (1997) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 268 (1994)). "The aim of the presumption is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct." *Republic of Austria v. Altmann*, 541 U.S. 677, 696 (2004). Courts apply a two-step analysis "when an objection is made to applying a particular statute said to . . . impose some burden on the basis of an act or event preceding the statute's enactment." *Fernandez-Vargas v. Gonzales,* 548 U.S. 30, 37 (2006). First, the court looks to "whether Congress has expressly prescribed the statute's proper reach." *Id.* at 37 (quoting *Landgraf*, 511 U.S. at 280). If the answer to the first question is "yes," the statute applies retroactively unless it runs afoul of the constitution. *Landgraf*, 511 U.S. at 280. If the answer is "no," the court "asks whether applying the statute to the person objecting would have a retroactive consequence in the disfavored sense." *Fernandez-Vargas*, 548 U.S. at 37. If so, the statute cannot apply retroactively absent a clear indication that Congress intended that result. *Id.* at 37-38.

**[6]** Congress did not expressly state that section 1595 applies to conduct pre-dating its enactment. Thus, the dispositive question is whether the provision has a "retroactive consequence." Ditullio makes two arguments that it does not. First, she argues that "§ 1595 does not impose new consequences" because she could already recover damages from Boehm under state law. Second, Ditullio argues that her case arises out of a "continuing violation"—that is, that because she has alleged that Boehm engaged in prohibited conduct directed towards her *after* the TVPA's enactment, the statute does not actually affect conduct *completed* before the statute's enactment. These arguments are unavailing. We hold that § 1595 of the TVPA cannot be applied retroactively to con-

duct before December 19, 2003 because to do so would impose new burdens and consequences on Boehm for pre-enactment conduct.

### a. *Retroactive Consequence*

"A statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating from the statute's enactment . . . . Rather, the court must ask whether the new provision attaches new legal consequences to events completed prior to its enactment." *Landgraf*, 511 U.S. at 269-70 (internal citation omitted). The Supreme Court has emphasized that there is no test for when a statute attaches new legal consequences; rather it "is a matter on which judges tend to have sound instincts and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.* at 270. (internal quotation marks, alterations, and citation omitted).

**[7]** The most common formulation of a "retroactive consequence" was articulated in *Landgraf*. There, the Supreme Court considered whether § 102 of the Civil Rights Act of 1991 (permitting victims of employment discrimination actionable under Title VII to seek compensatory and punitive damages in a jury trial) could be used by a plaintiff complaining of discrimination predating the Act's effective date, but whose case was pending when the Act took effect. 511 U.S. 244, 249-50. The Court recognized that a statute operates retrospectively if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Id.* at 269 (quoting *Soc. for Propagation of the Gospel v. Wheeler*, 22 F.Cas. 756 (No. 13, 156) (CCNH 1814) (Story, J.)).[6] It held

---

[6]In *Hughes Aircraft*, the Court rejected the argument that this language defined the "outer limits of impermissible retroactivity." 520 U.S. at 946-47. It stated that *Landgraf* "merely described that any such effect con-

DITULLIO v. BOEHM

that the subsection of § 102 authorizing punitive damages would clearly have a retroactive effect, and noted that punitive damages "share key characteristics of criminal sanctions," so that "[r]etroactive imposition of punitive damages would raise a serious constitutional question" even if Congress has explicitly authorized punitive damages for pre-enactment conduct. *Landgraf*, 511 U.S. at 281. The Court also recognized that compensatory damages, which are "quintessentially backward looking," "would attach an important new legal burden" to conduct. *Id.* at 282-83. *Landgraf* establishes that statutes authorizing punitive and compensatory damages create new liabilities, and may not be imposed retroactively absent clear congressional intent. *Id.* at 281-83.

**[8]** Section 1595 creates a civil cause of action that permits victims of trafficking to recover compensatory and punitive damages from individuals who violate the TVPA.[7] It changed substantive law and attached new legal burdens to violations of the TVPA. As a result, under *Landgraf*, section 1595 cannot apply retroactively to conduct that occurred before its effective date.

Ditullio argues that Alaska Statutes § 09.55.650 subjected Boehm to liability before the TVPA's civil remedies provision was enacted. The statute permits "[a] person who, as a minor under 16 years of age, was the victim of sexual abuse" to "maintain an action for recovery of *damages* against the perpetrator . . . *for an injury or condition suffered as a result of the sexual abuse*." Alaska Stat. § 09.55.650 (emphasis

---

stituted a *sufficient*, rather than a *necessary*, condition for invoking the presumption against retroactivity. *Id.* at 947. The Court did not, however, elaborate on the "outer limits" of impermissible retroactivity, instead holding that even applying Justice Story's formulation, the statute at issue had a retrospective effect. *Id.*

[7]Even if the remedies under § 1595 were limited to compensatory damages, it would attach new legal burdens and consequences to violations of the TVPA.

added). The TVPA civil remedy provision creates liability for conduct that is not encompassed by the Alaska statute. For example, under the TVPA there is liability for benefitting from sex trafficking of children. A person could violate this provision without ever having sexual contact with a minor; it therefore proscribes more than "sexual abuse" of a minor. *Compare* 18 U.S.C. §§ 1591, 1595 *with* Alaska Stat. § 09.55.650. Accordingly, Ditullio's argument that state law already permitted the full recovery available under § 1595 fails.

b. *"Continuing Violation" Theory*

Ditullio next argues that because "Boehm admitted that his conduct continued past the effective date of § 1595," the conduct was not *completed* before the statute took effect, and so the presumption against retroactivity is inapplicable. Ditullio relies on a line of immigration cases applying *Landgraf* to statutes whose retroactive application would interfere with vested rights. She argues that the party objecting to retroactive application of a statute must show reasonable reliance on the law as it existed prior to the new statute. *See e.g.*, *INS v. St. Cyr*, 533 U.S. 289 (2001); *Camins v. Gonzales*, 500 F.3d 872 (9th Cir. 2007). The issue in this case is whether retroactive application of § 1595 would create new liabilities under the TVPA, not whether it would interfere with vested rights, which is a separate line of analysis under *Landgraf*. *See Fernandez-Vargas*, 548 U.S. at 44 n.10 (distinguishing *St. Cyr*, "We understand Fernandez-Vargas' claim as falling within the second . . . categor[y] of retroactivity (new consequence of past acts), not the first category of canceling vested rights"). *St. Cyr* and its progeny are therefore inapposite.

The most analogous "continuing violation" cases consider employment discrimination that straddles the effective date of § 102 of the Civil Rights Act of 1991. In *Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475 (9th Cir. 1997), plaintiff brought a Title VII action, claiming sexual harass-

ment by Clark, a male co-worker, and sex discrimination based on her supervisor's failure to discipline Clark, her demotion, and her eventual termination. *Id.* at 1480. Some of the conduct occurred prior to the effective date of § 102, while some occurred after. This court held that, under *Landgraf*, Yamaguchi was "not entitled to compensatory damages and a jury trial for Clark's harassing conduct which occurred prior to November 21, 1991." *Id.* at 1482. On the other hand, the court stated that "Clark's harassment was a 'continuing violation' which began prior to the effective date of the [Civil Rights Act] and continued thereafter." *Id.* Thus, the court held, Yamaguchi "is entitled to pursue compensatory damages and a jury trial for post-November 21, 1991 conduct." *Id.*

**[9]** Under *Yamaguchi*, the continuing violation theory was not sufficient to overcome the *Landgraf* presumption against retroactivity for a provision creating new civil liabilities. This court's holding in *Yamaguchi* is consistent with cases in other circuits. *See, e.g., Caviness v. Nucor-Yamato Steel Co.*, 105 F.3d 1216, 1218 (8th Cir. 1997) (holding that the jury was erroneously instructed that it could award compensatory damages for illegal actions occurring before the effective date of § 102 of the Civil Rights Act of 1991 and remanding for a new trial); *Tomasello v. Rubin,* 167 F.3d 612, 619-20 (D.C. Cir. 1999) (rejecting plaintiff's argument that a continuing violation permits recovery for pre-Nov. 21, 1991 acts, noting that it has only entertained a "continuing violation" theory when necessary to give effect to the statutory purpose); *but see Place v. Abbott Lab.*, 215 F.3d 803, 807-08 (7th Cir. 2000) (declining to opine on the viability of the continuing violation theory, but stating that plaintiffs' allegations did not fit that mold); *DeNovellis v. Shalala*, 124 F.3d 298, 307 n.4 (1st Cir. 1997) (recognizing the viability of the theory but rejecting its application to plaintiff's case). Section 1595 is similar to the provision at issue in *Yamaguchi*. Both provisions create civil actions for conduct that was already illegal prior to their enactment. *Yamaguchi* therefore governs in this case. The continuing violation theory cannot be applied to

overcome the presumption against retroactive application of § 1595.

**[10]** For the foregoing reasons, we hold that § 1595 does not apply to pre-December 19, 2003 conduct. Permitting recovery for all of Boehm's alleged conduct would be an impermissible retroactive application of § 1595. No authority supports the position that a civil provision increasing liability for the entirety of a continuing violation does not have a retroactive consequence. This court's most analogous decision in *Yamaguchi* bars such retroactive application of a statute's damages provision.

V.

**[11]** We reverse the district court's determination that punitive damages are unavailable under the TVPA. We affirm the district court's conclusion that § 1595 cannot be applied retroactively to create liability for conduct that occurred before December 19, 2003. Whether Boehm engaged in conduct with Ditullio that violates the TVPA after December 19, 2003 is a factual question to be resolved on remand.

The parties shall bear their owns costs on appeal.

REVERSED IN PART AND AFFIRMED IN PART

---

CALLAHAN, Circuit Judge dissenting:

I agree with my colleagues that 18 U.S.C. § 1595 does not apply to Boehm's pre-December 19, 2003 conduct. However, despite Boehm's abhorrent conduct, I dissent from the majority's determination that punitive damages are available under § 1595. It may be desirable to authorize the recovery of punitive damages under § 1595, but Congress has yet to do so, and we are not empowered to do so for Congress.

The majority's reasoning is straightforward: (a) the statute is basically silent as to the availability of punitive damages; (b) punitive damages were allowed in common law when a tort was intentional and outrageous; (c) trafficking in humans almost by definition is intentional and outrageous; and (d) therefore a victim may seek punitive damages under § 1595.

The attraction of this approach is its simplicity. However, the Supreme Court's relevant opinions require a more sophisticated approach, one based on Congress's intent at the time the statute was enacted as well as an analysis of the law at that time.

The majority relies heavily on the Supreme Court's opinion in *Smith v. Wade*, 461 U.S. 30 (1983), in holding that it can look to the common law of torts to determine whether punitive damages are available under § 1595. It is true that *Wade* held that punitive damages are available under 42 U.S.C. § 1983, but *Wade* was a 5-4 decision, and more importantly, applying the Court's approach in *Wade* to § 1595 results in a determination that punitive damages are not available under the statute.

Section 1983 is derived from the Civil Rights Act of 1871. *Id*. at 34-35. The majority opinion in *Wade*, finding little evidence of Congress's intent in 1871, looked to common law as it then existed. *Id*. at 32. The majority basically reasoned that under common law "the punitive damages doctrine" was "accepted as settled law." However, then-Justice Rehnquist made a strong argument in his dissent that "a significant number of American jurisdictions refuse to condone punitive damage awards." 461 U.S. at 59.[1] Whatever the relative merits of the

---

[1] Justice Rehnquist's dissent was joined by Chief Justice Burger and Justice Powell. Justice Rehnquist noted:

A fundamental premise of our legal system is the notion that damages are awarded to compensate the victim — to redress the

competing positions, the Court's essential inquiry was to look to the law as it existed when Congress passed the legislation. The Supreme Court continues to adhere to this approach. *See Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2573 (2009) (quoting from *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990), that "We assume that Congress is aware of existing law when it passes legislation.").

Section 1595 was enacted as part of the Trafficking Victims Protection Act ("TVPA") in 2000. Pub. L. No. 106-386,

---

injuries that he or she actually has suffered. D. Dobbs, Remedies § 3.1 (1973); C. McCormick, The Law of Damages 1 (1935). In sharp contrast to this principle, the doctrine of punitive damages permits the award of "damages" beyond even the most generous and expansive conception of actual injury to the plaintiff. This anomaly is rationalized principally on three grounds. First, punitive damages "are assessed for the avowed purpose of visiting *a punishment* upon the defendant." C. McCormick, Law of Damages 275 (1935) (emphasis added); D. Dobbs, Handbook of the Law of Remedies § 3.9, at 205 (1973); K. Redden, Punitive Damages, § 2.1 (1980); *Electrical Workers v. Foust*, 442 U.S. 42, 48, 99 S. Ct. 2121, 2125, 60 L. Ed.2d 698 (1979). Second, the doctrine is rationalized on the ground that it deters persons from violating the rights of others. *Ibid*. Third, punitive damages are justified as a "bounty" that encourages private lawsuits seeking to assert legal rights. *Ibid*.

. . . .

Punitive damages are generally seen as a windfall to plaintiffs, who are entitled to receive full compensation for their injuries — but no more. Even assuming that a punitive "fine" should be imposed after a civil trial, the penalty should go to the state, not to the plaintiff — who by hypothesis is fully compensated. Moreover, although punitive damages are "quasi-criminal," *Huber v. Teuber*, 10 D.C. 584, 590 (1877), their imposition is unaccompanied by the types of safeguards present in criminal proceedings. This absence of safeguards is exacerbated by the fact that punitive damages are frequently based upon the caprice and prejudice of jurors. Walther & Plein, Punitive Damages; A Critical Analysis, 49 Marq. L. Rev. 369 (1966).

461 U.S. at 57-59.

114 Stat. 1464 (codified at 22 U.S.C. §§ 7101-7200 (2000)). In the intervening 130 years since the Civil Rights Act of 1871, the law has changed, and Congress, far from relying silently on common law, has demonstrated its ability to include, or not include, claims for punitive damages when it enacts legislation. For example, in the Civil Rights Act of 1991, Congress amended Title VII to authorize the recovery of compensatory and punitive damages in certain circumstances. *See United States v. Burke*, 504 U.S. 229, 232 n.2 (1992). Also, in 1989, Congress amended § 104(a)(2) of the Internal Revenue Code to provide that punitive damages were not sheltered from taxation. *Id.* at 244 n.3 (Justice Scalia concurring in the judgment). These actions, which took place prior to the TVPA, are noted in Supreme Court opinions and are representative of many other Congressional actions establishing that, by 2000, whether a federal statute authorized punitive damages depended on Congressional intent rather than on the existing common law.

The first draft of the TVPA, dated November 22, 1999, provided a civil action for a violation of § 1589, stating "the court may award actual damages, punitive damages, reasonable attorneys' fees and other litigation costs reasonably incurred." H.R. Rep No. 106-487(I), at 7 (1999). A second draft contained the same provision. H.R. Rep. No. 106-487(II), at 8 (2000). However, the third and final version of the TVPA, dated October 5, 2000, eliminated the civil damages provision altogether. H.R. Rep. No.106-939 (2000) (conf. rep.). Thus, as enacted in 2000, the TVPA did not create a private cause of action for damages, ordinary or punitive. Pub. L. No. 106-386. Instead, Congress focused on harsher criminal penalties.[2]

---

[2]President Clinton, in announcing his signing the TVPA into law, gave a summary of the ways in which the new legislation would combat human trafficking. He stated that the law "create[d] new felony criminal offenses for trafficking in human beings and subjects any person convicted of any of these new crimes to forfeiture of his or her assets." *White House Office*

In 2003, Congress reconsidered the TVPA in order to authorize appropriations for fiscal years 2004 and 2005, as well as for "other purposes." H.R. Rep. No. 108-264(II), at 1 (2003). At that time, Congress drafted a civil damages provision for the TVPA. The initial draft provided that a civil suit may be filed "in any appropriate district court of the United States [which] may award actual damages, punitive damages, reasonable attorneys' fees, and other litigation costs reasonably incurred." *Id.* at 5. However, when the revision was enacted, the TVPA civil remedy provisions allowed only for recovery of "damages and reasonable attorneys fees." 18 U.S.C. § 1595; *see also* 22 U.S.C. §§ 7101-7200. The provision for punitive damages was dropped.

This change may have resulted from a letter from the Department of Justice (DOJ) generally supporting the Trafficking Victims Protection Reauthorization Act of 2003, but opposing the creation of a private right of action.[3] H.R. Rep

---

*of Commc'ns, Radio Address Paper on Combating Violence Against Women President Clinton's Radio Address to the Nation: Legislation to Combat Violence Against Women, Fight Trafficking in Persons, and Assist Victims of Terrorism October 28, 2000, 10/29/00*, 2000 WL 1617213 (2000). *Compare with House Conference Report on No. 106-939.* The Report shows that Sec. 2002 of H.R. 3244 addresses anti-terrorism judgments rather than anti-trafficking, and specifically references punitive damages awards. This contrast suggests that had Congress intended to allow for punitive damages for anti-trafficking violations, it would have expressly provided for such damages in the TVPA.

[3]The DOJ cautioned that "creation of a private right of action is a complex undertaking that should be approached only after careful consideration of collateral consequences and the appropriate standard for establishing a civil violation." H.R. Rep. No.108-264(II), at 13. Rather than amending the TVPA to "creat[e] a federal civil remedy, one that would include treble damages," the DOJ suggested that amendment of the Racketeer Influenced and Corrupt Organizations Act (RICO) [(18 U.S.C. §§ 1961-19680] would be a more appropriate legislative action. *Id.* at 15-16. In addition, the DOJ questioned Congress's purpose as well as the need to create a new federal tort. *Id.* at 16. The department's letter reminded Congress that state tort laws encompass "the entire range of trafficking behaviors" under which a victim may recover, thus leaving no "need to recreate such a scheme at a Federal level." *Id.*

No. 108-264(II), at 3. The DOJ's letter is the only listed commentary on the proposed punitive damages section in the House Report. It appears that Congress partially heeded DOJ's advice and created a private cause of action for damages and attorneys' fees, but did not provide for punitive damages.[4] In sum, a review of the TVPA's legislative history shows that far from deferring to federal common law, Congress in 2003, when it created a private cause of action under TVPA, considered and declined to adopt language authorizing punitive damages.[5]

This Congressional decision should settle the matter even under *Wade*, 461 U.S. 30. In *Wade*, the Court first noted that "there was little in [§ 1983's] legislative history concerning the damages recoverable for this tort liability." *Id.* at 34. It was only "[i]n the absence of more specific guidance," that the Court "looked first to the common law of torts." *Id. See also Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 70-71 (1992) ("absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute"). Here, there is "clear direction;" there is "more specific guidance." In 2000 Congress consid-

---

[4]Congress again considered the TVPA in 2008, but did not add a provision for punitive damages. 154 Cong. Rec. H10888-01 (2008).

[5]This decision seems reasonable as it is not clear that punitive damages are necessary to punish the defendant or to fairly compensate a plaintiff. Section 1595 generally comes into play only after a defendant has been criminally convicted in violation of 18 U.S.C. § 1591. Section 1591(b) provides for substantial mandatory sentences for individuals convicted under § 1591(a), § 1593 provides for mandatory restitution, and § 1594(d) provides for forfeitures. The mandatory restitution appears to include "medical services relating to physical, psychiatric, or psychological care," "physical and occupational therapy or rehabilitation," "necessary transportation, temporary housing, and child care expenses," "lost income," "attorneys' fees, as well as other costs incurred," and "any other losses suffered by the victim as a proximate result of the offense." 18 U.S.C. § 2259(b)(3). In addition, there is no question that § 1595 provides full compensatory damages and attorneys' fees.

ered creating a private cause of action including punitive damages and decided not to create a private cause of action at all. In 2003, Congress again considered creating a private cause of action including punitive damages, and this time did create a private cause of action but omitted the proposed language that allowed for punitive damages. We should abide by Congress's decision.

Finally, recognizing that Congress did not provide for punitive damages in § 1595 is consistent with a long-standing tenet of statutory interpretation. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979); *see also Owner-Operator Independent Drivers Ass'n v. Swift Transp. Co.*, 632 F.3d 1111, 1121 (9th Cir. 2011) (same); *City of Colton v. American Promotional Events, Inc.-West*, 614 F.3d 998, 1007 (9th Cir. 2010) (same). Here, TVPA's legislative history shows that Congress deliberately limited civil remedies to compensatory damages and attorneys' fees. We should not go further.

As then-Justice Rehnquist noted in his dissent in *Wade*, 461 U.S. at 57-59, creating a claim for punitive damages raises concerns that are distinct from defining the scope of compensatory damages. Here, Congress implicitly recognized this when it enacted the TVPA and its provision for a civil remedy. Congress considered several drafts that included provisions for punitive damages, but ultimately, after being advised by DOJ of the problems inherent in the creation of a private cause of action, passed legislation that does not provide for punitive damages. I dissent because, regardless of the desirability of allowing for punitive damages under 18 U.S.C. § 1595, Congress chose not to do so, and we should abide by its decision.